UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                                            :
JOSEPH INSINGA,                                             :     03 Civ. 7775 (RJH)
                                                            :
                              Plaintiff,                    :
                                                            :     **MEMORANDUM**
              - against -                                   :     **OPINION AND ORDER**
                                                            :
COOPERATIEVE CENTRALE                                       :
RAIFFEISEN BORENLEENBANK B.A.,                              :
RABOBANK NEDERLAND and                                      :
DOE CORPORATIONS 1-5,                                       :
                              Defendants.                   :
                                                            :
------------------------------------------------------------x

Plaintiff Joseph Insinga brought this diversity action against Cooperatieve Centrale Raiffeisen Borleenbank B.A., Rabobank Nederland ("Rabobank" or the "Bank") and Doe Corporations 1-5, asserting claims of age discrimination, retaliation, breach of contract and fraudulent inducement under New York law.[1] Rabobank has now moved for partial summary judgment with respect to plaintiff's claims of fraudulent inducement and breach of contract. For the reasons set forth below, the Court grants Rabobank's motion in its entirety.

## BACKGROUND

Unless otherwise indicated, the following facts are undisputed.[2] Rabobank is a Netherlands-based commercial bank with approximately 450 employees in its New York

---

[1] In their notice of removal, defendants asserted the existence of diversity jurisdiction, representing that they were not citizens of either New York or New Jersey and that plaintiff was a citizen of New Jersey.

[2] The facts as herein recited are drawn from defendant's Rule 56.1 Statement of Undisputed Material Facts ("Def.'s 56.1 ¶ __"); plaintiff's Response to Defendant's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("Pl.'s 56.1 ¶ __"); Declaration of Mark Lerner in Support of Defendant's Motion for Summary Judgment ("Lerner Decl. ¶ __") and attached exhibits); Transcript of deposition testimony of Joseph Insinga ("Insinga Dep. Tr. at __") annexed as Exhibit B to Lerner Decl.; Transcript of deposition testimony of J.W. (Hans) den Baas ("den Baas Dep. Tr. at ___") annexed as Exhibit C to Lerner Decl.;

1

branch. (Def.'s 56.1 ¶ 1; Pl.'s 56.1 ¶ 1.) In August of 1990, Rabobank hired Insinga as a loan workout officer in its Special Asset Management department. (Def.'s 56.1 ¶ 2; Pl.'s 56.1 ¶ 2.) Insinga subsequently transferred from the Special Asset Management department to the Corporate Finance Department, which was headed by J.W. "Hans" den Baas. (Def.'s 56.1 ¶ 3; Pl.'s 56.1 ¶ 3.) Insinga started working on transactions for den Baas and eventually became promoted to managing director in 1995. (Insinga Dep. Tr. at 363.)

I.      The Yorkshire Food Group P.L.C. Workout

In 1997, the New York branch of Rabobank assumed responsibility for a credit from Rabobank's London office and another bank, NatWest, in an entity known as the Yorkshire Food Group P.L.C. ("Yorkshire"). (Def.'s 56.1 ¶ 4.) Plaintiff contends further that Rabobank increased its exposure to $110 million at the direction of den Baas and Reinier Mesritz, the General Manager and highest officer at Rabobank in North and South America during that period. (Pl.'s 56.1 ¶ 4.)

Within two weeks, the credit situation became "dire" as Yorkshire was unable to repay its debt. (Def.'s 56.1 ¶ 5; Pl.'s 56.1 ¶ 5.) Rabobank was forced to place the loans in workout status and sought to convert the remaining Yorkshire assets into funds for repaying the outstanding loans. (*Id.*) The parties agree that because of Insinga's extensive workout experience, den Baas asked him to handle the Yorkshire workout even though Insinga was in the Corporate Finance Department and no longer in the Special

---

Affidavit of Joseph Insinga ("Insinga Aff. ¶ __") and annexed exhibits; Affidavit of Brian Heller ("Heller Aff. ¶ __") and annexed exhibits); Transcript of deposition testimony of Cor Broekhuyse ("Broekhuyse Dep. Tr. at __") annexed to Heller Decl.; Transcript of deposition testimony of Guillermo Bilbao ("Bilbao Dep. Tr. at __") annexed to Heller Decl.

2

Asset Management department.  (Def.'s 56.1 ¶ 6; Pl.'s 56.1 ¶ 6; den Baas Dep. Tr. at 31.)  den Baas admitted that the Yorkshire workout potentially presented the largest risk of loss that Rabobank had ever faced.  (den Baas Dep. Tr. at 41.)  The parties agree that in or about December 1997, Insinga was, at the very least, "hesitant" and "was not happy" about taking the assignment.  (Def.'s 56.1 ¶ 7; Pl.'s 56.1 ¶ 7; den Baas Dep. Tr. at 72.)  Insinga "raised the problem that [the workout] would be a full-time job" and that he would rather work on "new transactions than trying to work out a bad transaction."  (den Baas Dep. Tr. at 58-9.)

It is undisputed that plaintiff's preference was to continue his work in the corporate finance group.  (Insinga Dep. Tr. at 21; den Baas Dep. Tr. at 70.)  He told Rabobank – specifically, Mesritz, Guillermo "Bill" Bilbao (General Counsel of Rabobank) and den Baas – that he was "willing to consider a temporary assignment on Yorkshire provided I got certain very clear assurances concerning my career, salary and bonus, which is compensation, business cards, a secretary, office, work with colleagues in corporate finance."  (Insinga Dep. Tr. at 21; den Baas Dep. Tr. at 76.)  Plaintiff opined that he would not have taken the assignment and "sacrifice[d] 30 years of hard work, my entire career aimed at getting into the corporate finance industry …" had he known that there were any doubts as to his ultimate return to corporate finance.  (*Id.* at 22.)

den Baas admits that he told Insinga that he could return to Corporate Finance once he finished the workout in order to "induce" him to say yes.  (den Baas Dep. Tr. at 71.)  However, Insinga notes that "the intent of the parties was that no one knew how long it would take for that Yorkshire assignment to be completed."  (Insinga Dep. Tr. at 11.)  Ultimately, Insinga agreed to take the assignment.  (Def.'s 56.1 ¶ 8; Pl.'s 56.1 ¶ 8.)

3

2.  The January 3, 2000 Agreement

In December of 1997, Insinga began handling the Yorkshire workout, reporting directly to Mesritz and without den Baas in his reporting line. (Def.'s 56.1 ¶ 10; Pl.'s 56.1 ¶ 10.) Plaintiff stated that the "Yorkshire workout was a Herculean task and consumed all my time." (Insinga Aff. ¶ 33.) The Bank was pleased with his performance. In a letter dated September 17, 1998, Mesritz told Insinga that "[d]ue to your outstanding efforts with regard to Yorkshire, which is inhibiting you from actively engaging in any other profitable business activity, the Bank will guarantee to you a minimum bonus payment equal to your 1997 bonus of $450,000…" (Insinga Aff., Ex. B.) Because Insinga believed that Mesritz might be transferred to another position before the Yorkshire workout was completed, he discussed with Mesritz his desire "to have some written evidence of his assurances regarding certain aspects of the Yorkshire project." (Insinga Aff. ¶ 46.) However, Insinga did not "request, or even suggest, that the written agreement address my return to the Corporate Finance Group." (*Id*. ¶ 47.)

On October 27, 1999 – nearly two years after Insinga had already begun the Yorkshire workout – Insinga presented Mesritz with a proposed agreement reflecting the terms of his assignment to the Yorkshire workout. Insinga's lawyer who was not associated with Rabobank prepared the initial draft. (Def.'s 56.1 ¶ 11; Pl.'s 56.1 ¶ 11.) It is undisputed that Mesritz did not sign this first draft. (*Id*.) Indeed, the parties engaged in extensive negotiations and drafts over the next few months. (Lerner Decl., Exs. H-J.)

On November 29, 1999, Insinga wrote Mesritz a memo conveying his desire to return to the Corporate Finance Group. (Insinga Aff., Ex. C.) In this memo, Insinga

expressed that he had "been relying on the bank's agreement that when I stop my efforts on Yorkshire, I will return to my old position in the Corporate Finance Group." (*Id*.) Ultimately, he wrote that "[if] my Yorkshire work ends in the near future, I wish to return to Corporate Finance at the first opportunity (Hans has advised [me that] my old position is available to me)." (*Id*.)

The parties finally executed an agreement dated January 3, 2000 (the "Agreement"), although defendant claims that the Agreement was signed sometime after April 26, 2000. (Def.'s 56.1 ¶ 12; Pl.'s 56.1 ¶ 12.) It is undisputed that before signing the Agreement, Insinga was represented by counsel, read the Agreement and understood it. (Def.'s 56.1 ¶ 13; Pl.'s 56.1 ¶ 13.) The Agreement stated that its purpose was to "confirm[] the terms of your assignment as an employee of Rabobank relative to the workout and collection of Rabobank's interest in Yorkshire…" (Lerner Decl., Ex. K.) The Agreement was effective by its terms through March 31, 2001. (*Id*.)

The Agreement specifically provided that it "can be extended by us, at our sole discretion, under the same terms and conditions herein, to March 31, 2002 and beyond." (*Id*.) The Agreement also contained a "Change in Purpose" clause, which stated:

> In the event that after March 31, 2000 both (i) Henk Gentis and I are no longer associated with Rabobank or the Yorkshire group of companies, or you are no longer report [sic] to either of us, and (ii) new management requires that you sell all or a material part (greater than 35% of the market values of Yorkshire U.S. assets) of the Yorkshire group of companies in a manner different than we have agreed to date, over your reasonable objections, you will have the following options after you assist with the successful completion of the sale: (1) transfer to a similar level position within the Bank and receive a bonus, payable in 2001 when bonuses are paid to management by Rabobank but no later than March 31, 2001, equal to the sum of (a) a pro-rata share of the $500,000 annual bonus incentive calculated based on the number of months worked on the New Assignment in 2000 over 12) [sic], plus (b) $1,350,000 in lieu of any additional fees you would be entitled to receive under Additional Fees above; or (2) voluntarily terminate your employment with the Bank and receive the $500,000 annual incentive bonus,

5

> six months salary continuation and $1,350,000 in lieu of any additional fees you would be entitled to receive under Additional Fees above, subject to signing Rabobank's standard Release and Waiver.

(*Id*.) The Agreement further contained a "Non Renewal or Termination Without Cause" clause, which provided:

> You acknowledge that you can be terminated without cause at any time at Rabobank's sole discretion. If you are terminated without cause prior to March 31, 2001 (or such later date as applicable if Rabobank extends this Agreement) or we do not renew this Agreement under the existing terms through March 31, 2002, you shall receive the full bonus for the year 2000 (or such later year as applicable if Rabobank extends this Agreement), plus $1,350,000 in lieu of any Additional Fees you would be entitled to receive, plus six months salary continuation, subject to signing Rabobank's standard Release and Waiver. Cause is specifically intended to be your conviction for a felony or your intentional refusal to perform the services required by you in a manner similar to that which you previously rendered after written notice by us to you on behalf that you have failed to so perform and you have failed to cure such defect within sixty (60) days after you have received such written notice.

(*Id*.)

According to defendant, the Agreement "did not guarantee that after the Yorkshire workout was completed, or if it ended early, [Insinga] would continue to have a position in the Corporate Finance Department, or even a position at the Bank." (Def.'s 56.1 ¶ 20.) Plaintiff claims, however, that the "Change in Purpose" provision was "consistent with prior oral assurances of Rabobank that Insinga would return to Corporate Finance once the Yorkshire workout was complete, although the Agreement was not intended to address those assurances." (Pl.'s 56.1 ¶ 19.) Moreover, plaintiff asserts that the Agreement "did not contradict these oral assurances in any way and guaranteed that [he] would be permitted to return to a 'similar position' in the Bank once the workout was complete." (*Id*. ¶ 20.)

6

3. The Extension Agreement

It is undisputed that in March of 2001, the Yorkshire workout was continuing. (Def.'s 56.1 ¶ 22; Pl.'s 56.1 ¶ 22.) Plaintiff and Rabobank entered into an extension agreement dated March 22, 2001 (the "Extension Agreement"). (Def.'s 56.1 ¶ 23; Pl.'s 56.1 ¶ 23.) The Extension Agreement specifically referred to and largely confirmed the terms of plaintiff's assignment as set forth in the Agreement and extended the assignment for one year. (Lerner Dec., Ex. L.) Specifically, the 2001 Extension Agreement provided:

> Your responsibilities will remain the same through the Extended Completion Date [March 31, 2002], as will your Salary, Incentive Bonus and Additional Fees. You understand and agree that it is your goal under this assignment to sell the assets of the Yorkshire Group of Companies as soon as possible, and in any case by March 1, 2002, and that any such sale (including any liquidation) will not constitute a Change in Purpose under the Agreement. You also understand and agree that as of April 1, 2001, Reinier Mesritz will no longer be directly involved in the Yorkshire matter and that he will be replaced by Guillermo Bilbao until September 1, 2001 and Cor Broekhuyse thereafter. This change in personnel will not give rise to any claims by you under the [2000] Agreement.

(*Id.*) In effect, the Extension Agreement "eliminated Insinga's right to the options contained in the 'Change in Purpose' section of the initial Agreement." (Def.'s 56.1 ¶ 26; Pl.'s 56.1 ¶ 26.) Insinga admitted that he read this provision and that Bilbao had told him that:

> I would temporarily be reporting to him, Reinier was being transferred, and that Cor would replace Reinier in September and I would then be reporting to Cor. So Bill explained that to me and that is what I understood.

(Insinga Dep. Tr. at 50-51.) He further admitted that the "Change in Purpose" provision in the original Agreement had not been triggered. (*Id.* at 51.)

7

Bilbao testified that the purpose of the Extension Agreement was to "[e]xtend the arrangement for one year and amend certain other provisions." (Bilbao Dep. Tr. at 92.) Insinga testified that he signed the agreement without having his counsel review it based on Bilbao's assurances that "nothing was changed." (Insinga Dep. Tr. at 44-51.)

In September of 2001, Cor Broekhuyse replaced Mesritz as General Manager of the Bank for the Americas and asked Insinga to sell the Yorkshire assets. (Def.'s 56.1 ¶ 25; Pl.'s 56.1 ¶ 25.) Insinga recommended to Broekhuyse that the timing of the sale was inappropriate but nevertheless followed the Bank's instructions to sell the assets. (Insinga Dep. Tr. at 54.)

4.  Insinga's Employment at Rabobank From January of 2002 to March of 2003

In early 2002, plaintiff was still providing services in connection with the Yorkshire workout. (Def.'s 56.1 ¶ 28; Pl.'s 56.1 ¶ 28.) Defendant claims that the Yorkshire workout was winding down at this point and did not require Insinga's full attention. (den Baas Dep. Tr. at 89.) According to plaintiff, he told den Baas in January of 2002 that he wanted to return to Corporate Finance. (Insinga Dep. Tr. at 78.) den Baas allegedly told him that he preferred plaintiff to continue working on Yorkshire until all the assets were sold. (*Id*.) Plaintiff further alleges that Broekhuyse did not view the Yorkshire workout as being completed until he had sold all of the assets. (Insinga Dep. Tr. at 19.) In response to Insinga's suggestion that he transfer his responsibilities to another person, Broekhuyse allegedly responded as follows:

> [N]o, I don't want to do that. I want you to continue working on Yorkshire as you have in the past. Nothing has changed, as far as I am concerned. You are to carry on as you have in the past until all the assets are past. And while I appreciate you want to go back to corporate finance and Hans will allow you to start phasing back into corporate finance, your primary duties and your assignment is [sic] not complete until all the assets have been sold.

8

(*Id*. at 79.)  According to plaintiff, Bilbao also told him to "concentrate on finishing your assignment as quickly as possible and then you can go back to corporate finance when you're done." (Insinga Dep. Tr. at 88.)  den Baas admitted that, as late as February 2003, plaintiff was still "directing certain things that had to happen with Yorkshire" and was following "from a distance" the litigation the Bank had initiated against certain third parties.

Yet plaintiff also admitted that by mid-2002, he was able to work on projects in Corporate Finance that were unrelated to the Yorkshire workout. (Def.'s 56.1 ¶ 29; Pl.'s 56.1 ¶ 29.)  Thus, he testified that "in 2002, as we started winding down, I started phasing back into corporate finance." (Insinga Dep. Tr. at 364.)  During this period, plaintiff worked on a $75 million preferred stock issuance for Occidental Petroleum, a $100 million financing of a wind-power project and a $15 million project with J.P. Morgan in Australia. (*Id*.)  Plaintiff nevertheless claims that den Baas prevented him from resuming his corporate finance duties so that he could continue to focus on the Yorkshire workout. (*Id*. at 94.)

Defendant contends that the Agreement and Extension Agreement expired, by their terms, on March 31, 2002. (Def.'s 56.1 ¶ 31.)  Defendant also points to statements Insinga allegedly made to his therapist on April 11, 2003, in which he acknowledged that in March of 2002, Rabobank was unwilling to extend the agreements for a third year. (Def.'s 56.1 ¶¶ 42-43.)[3]  Plaintiff asserts that he understood the agreements to be

---

[3] Insinga's therapist wrote the following notes:
> 3/00 – 3/02 – rec'd contract to stay at Yorkshire project protecting J[oe], but by 3/02 Bank didn't want to renew J[oe]'s contract because Y[orkshire] almost done – but he should continue what he was doing AND was allowed to work on deals in Corp[orate] Fin[ance].

(Def.'s 56.1 ¶¶ 43-44.)

9

extended for a second time in early 2002. (Insinga Dep. Tr. at 79.) When plaintiff approached Bilbao about an extension in January 2002, Bilbao allegedly told him that he had no time to deal with the paperwork. (*Id*. at 80). Plaintiff responded "well, that's okay, as long as the provisions of my agreement remain in full force and effect." (*Id*.) Bilbao allegedly told plaintiff, "[W]ell, that's a business decision, you need to talk to den Baas and Broekhuyse about that. You know, I'm only looking at it from the legal perspective." (*Id*.) However, plaintiff did not have any discussions with either den Baas or Broekhuyse regarding an extension of the written agreements. Nevertheless, plaintiff believed that the Agreement had been extended because den Baas told him "your assignment continues as you have in the past, nothing's changed." (*Id*. at 80-82.)

As the Yorkshire workout was nearing its completion, den Baas told Broekhuyse in January, February and March of 2003 that he was looking for suitable activity for Insinga in the Corporate Finance department. (den Baas Dep. Tr. at 106.) Insinga claims that any work he managed to secure in corporate finance came from his own efforts. (Insinga Aff. ¶ 81.) He also claims that den Baas was channeling work away from him and giving it to another employee. (Insinga Dep. Tr. at 95.) Regardless of his success in migrating back to corporate finance transactions, it appears undisputed that Insinga's assignment to the Yorkshire workout formally ended in February 2003. On February 19, 2003, Insinga wrote an email to Gentis stating that he would be "transferring all Yorkshire business duties to Hans [at the] end of Feb [sic] and at the same time all responsibility for litigation matters will be given to Bill Bilbao." (Heller Aff., Ex. G.) He further wrote that he understood "from Hans I will start back full time in Corp. Finance March 1 as my Yorkshire assignment/arrangement will be finally over." (*Id*.)

10

Consistent with this testimony, plaintiff did not contend at his deposition that Robobank extended the Agreement for a third time in March 2003. (Insinga Dep. Tr. at 35.)

5.  Insinga's Termination in April 2003

On April 7, 2003, Broekhuyse and Bilbao met with Insinga and informed him that his employment with the Bank was being terminated. He was terminated "without cause" being told that management had not been able to find another position for him within Rabobank. (Def.'s 56.1 ¶ 38; Pl.'s 56.1 ¶ 38.) Defendant faxed plaintiff a proposed severance agreement that stated the termination date was April 30, 2002. (Lerner Decl., Ex. M.) Plaintiff claims that he was told at the meeting that the termination was effective March 31, 2002, although he later acknowledged that after receiving the fax, he "learned that my termination was, in fact, effective April 30th." (Insinga Dep. Tr. at 137-38.) At his deposition, Insinga testified that he:

> was just so stunned that I asked Cor Broekhuyse to confirm that, in fact, is that what you mean, I've been terminated retroactive to March 31st. And he said that's correct. And then I subsequently learned that it was actually April 30th.

(*Id*. at 138.) Plaintiff rejected defendant's proposed severance agreement and this litigation ensued. (Pl.'s 56.1 ¶ 39.)

## DISCUSSION

I. <u>Summary Judgment Standard</u>

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 57 (2d Cir. 1997) (quoting Fed. R. Civ. P. 56(c)). In reviewing the record, the district court must assess the evidence in "the light most favorable to the non-moving party," resolve all ambiguities, and "draw all reasonable inferences" in its favor. *Am. Cas. Co. v. Nordic Leasing, Inc.,* 42 F.3d 725, 728 (2d Cir. 1994); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

An alleged factual dispute between the parties will not by itself defeat a motion for summary judgment, since "the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48 (emphasis in original). In order to defeat such a motion, the non-moving party must affirmatively set forth facts showing that there is a genuine issue for trial. *Id.* at 256; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Specifically, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial. *See Anderson*, 477 U.S. at 256-57; *Gross v. Nat'l Broad. Co.*, 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002). "A fact issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Mitchell v. Shane*, 350 F.3d 39, 47 (2d

Cir. 2003) (quoting *Anderson*, 477 U.S. at 248). "A fact is 'material' if it might affect the outcome of the suit under governing law." *Id.* (quoting *Anderson*, 477 U.S. at 248.)

Summary judgment may also be granted when the opposing party fails to establish an element essential to that party's case and on which that party would bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986). Indeed, summary judgment is "mandated" when "the evidence is insufficient to support the non-moving party's case." *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 61 (2d Cir. 1998).

II.    Plaintiff's Fraudulent Inducement Claim

Insinga's fraudulent inducement claim alleges that, in order to induce plaintiff to accept an assignment to the Yorkshire workout, den Baas falsely represented that Insinga could return to the Corporate Finance Department once the workout was completed. (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summary J. ("Pl.'s Mem.") at 11.) Specifically, plaintiff asserts that Rabobank "had no intentions of honoring these assurances at the time it made them, so that [he] damaged his entire career at the time he agreed to leave Corporate Finance based on lies." (*Id.*) Defendant concedes that den Baas made such a statement in 1997 and did so to persuade plaintiff to accept the Yorkshire assignment (den Baas at 70-71). Defendant contends, however, that plaintiff has not met his burden of presenting evidence that den Baas intended <u>not</u> to honor his promise at the time it was made. (Def.'s Reply Mem. in Supp. of Mot. for Summary J. ("Def.'s Reply Mem.") at 8-9).

A plaintiff asserting fraud under New York law must establish that: "(1) the defendant made a material false representation, (2) the defendant intended to defraud the

13

plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Bridgestone/Firestone v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996) (quoting *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir, 1995)). Proof of the first element of a fraud claim requires a false "representation of present fact." *Deerfield Commun. v. Chesebrough-Ponds's*, 68 NY2d 954, 956 (1986) (citations omitted), and "[m]ere promissory statements as to what will be done in the future are not actionable." *Sabo v. Delman*, 3 N.Y.2d 155, 160 (1957). It is settled law, however, that, "if a promise was actually made with a preconceived and undisclosed intention of not performing it, it constitutes a misrepresentation of 'a material existing fact' upon which an action [based on fraudulent inducement] may be predicated." Id. (internal citations omitted).

As noted, den Baas admitted that he told Insinga that he could return to Corporate Finance once he finished the Yorkshire workout in order to induce Insinga to accept the assignment. (den Baas Dep. Tr. at 71.) Yet, plaintiff has failed to identify any portion of the record indicating that den Baas made this promise with the "preconceived and undisclosed intention of not performing" it. *See Sabo*, 3 N.Y.2d at 160. den Baas' uncontroversial acknowledgment that "the longer you are away from the business, the more you are going to miss the development of that business" (den Baas Dep. Tr. at 176), hardly creates an inference of a preconceived misrepresentation. And plaintiff himself acknowledged that, at the time he became involved in the Yorkshire workout, "no one knew how long it would take for that Yorkshire assignment to be completed." (Insinga Dep. Tr. at 11.) Moreover, plaintiff's assertion that he was not permitted to

14

return to the Corporate Finance Department in 2003 is itself insufficient to show fraudulent intent at the time den Baas' promise was made in 1997. *Orderline Wholesale Distributors v. Gibbons, Green, van Amerongen, Ltd.*, 675 F. Supp. 122, 129-30 (S.D.N.Y. 1987) ("Where the only proof is that the defendant failed to keep his promise, it is insufficient to establish that the defendant did not intend to perform at the time the promise was made"); *National Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 664 (S.D.N.Y. 1991) ("The law is well settled, however, that a party may not establish fraudulent intent solely from the non-performance of the future event.") (citing cases); *SNCB Corporate Finance Ltd. v. Schuster*, 877 F. Supp. 820, 826 (S.D.N.Y. 1994) (same). While plaintiff speculates that den Baas and Mesritz "would have said whatever they had to say to convince Insinga to help Rabobank," (Pl.'s Mem. at 14-15), plaintiff must come forward with evidence that would permit a jury to reasonably find each element of his fraud claim to survive summary judgment. *Orderline Wholesale Distributors,* 675 F. Supp. at 129-30 (granting defendants' motion for summary judgment where plaintiffs failed to show that defendant "did not intend to perform at the time the alleged representations to the contrary were made."); *SNCB Corporate Finance Ltd.*, 877 F. Supp. at 826.

To be sure, issues of fraudulent intent are generally left for resolution by the factfinder. *See National Union Fire Ins. Co. of Pittsburgh v. Turtur*, 892 F.2d 199, 205 (2d Cir. 1989). However, summary judgment is appropriate here since plaintiff, the opposing party, has failed to produce any material evidence supporting the allegation that den Baas' 1997 promise was false when made. *Celotex Corp.*, 477 U.S. at 321.

Accordingly, the Court grants defendant's motion for summary judgment with respect to plaintiff's fraudulent inducement claim.

III.     Plaintiff's Breach of Contract Claims

Plaintiff has further alleged that defendant breached the Agreement when (A) the Bank terminated him without cause in April of 2003 and did not pay him incentive fees allegedly due under the Agreement and (B) the Bank modified the terms of the Change of Purpose provision and failed to make payments allegedly do thereunder. (Pl.'s Mem. at 23-24.) Defendant responds that the Agreement and the Extension Agreement that expired prior to the date plaintiff was terminated, and (B) that plaintiff agreed to and accepted the modified terms in the Extension Agreement and thereby waived any claims under the Change of Purpose provision. (Def.'s Reply Mem. at 4-5.)

    *A.     Plaintiff's Termination Without Cause*

To establish a breach of contract claim under New York law, the plaintiff must show "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *First Investors Corp. v. Liberty Mutual Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998) (internal citations omitted). The threshold issue is whether there was a contract in existence at the time plaintiff was terminated in April 2003. As defendant has pointed out, the original Agreement expired by its terms on March 31, 2001. (Lerner Decl., Ex. K.) It is also undisputed that the 2001 Extension Agreement expired by its terms on March 31, 2002. (Id., Ex. L.) Nevertheless, plaintiff claims that the Agreement was renewed annually by operation of law in March 2002 and again in March 2003 because he continued to work on the Yorkshire transaction as directed by Robobank until the date of his termination.

The New York Court of Appeals has stated that "where one enters into the employ of another under a contract for a year's service at a yearly salary and continues in the employment after the year's end, there is available an inference or implication of fact that the parties intended to renew for another year." *Cinefot International v. Hudson Photographic Industries*, 13 N.Y.2d 249, 252 (1963); *Adams v. Fitzpatrick*, 125 N.Y. 124, 129 (1890) ("When a person has been employed by another for a certain definite time at fixed wages, if the services are continued after the expiration of the term, in the same business, it is presumed that the continued services are rendered upon the same terms.") (quoting treatise); *see also Borne Chemical Co., Inc. v. Dictrow*, 85 A.D.2d 646, 648-49 (1st Dep't 1963). This presumption of "automatic renewal" may be rebutted by "proof of a new agreement or of facts showing that the parties intended otherwise." *Pohlers v. Exeter Mfg. Co.*, 52 N.Y.S.2d 316, 317 (N.Y. Cty. Ct. 1944).

Defendant claims that the undisputed facts show that the parties did not intend to renew the Agreement for a third year (i.e., from March 2002 to March 2003). In support of this argument, defendant points to plaintiff's work on other projects in unrelated corporate finance matters during this period as evidence that plaintiff's assignment had changed, (Def.'s 56.1 ¶ 29; Pl.'s 56.1 ¶ 29), as well as his alleged statements to his therapist acknowledging that the Bank was unwilling to extend the agreements past March 31, 2002. (Lerner Decl., Ex. O.) It is undisputed that plaintiff requested Robobank General Counsel, Guillermo Bilbao, in January 2002, to extend the Agreement and that Bilbao told plaintiff that he (Insinga) would have to discuss this with "the business people." (Insinga Dep. Tr. at 90.) While plaintiff concedes that he never asked den Baas or Brockhoyse to extend the term of the Agreement, he claims that they said

"carry on as in the past and nothing's changed." (Id. at 80-81.) Plaintiff further testified that "[n]othing changed [in my assignment] from January, February, March, April, May, June, July, August 2002." (Insinga Dep. Tr. at 81.) And while it appears that plaintiff did begin to work on unrelated corporate finance matters in 2002, it also appears that plaintiff still had primary responsibility for Yorkshire although it may not have taken 100% of his time (den Baas at pp. 89-90). Plaintiff has therefore raised an issue of fact as to whether the Agreement was renewed by course of conduct for the period March 31, 2002 to March 31, 2003.

Even assuming that the Agreement had been extended another year to March 31, 2003, there is no evidence that the Agreement was renewed a third time, for the period March 2003 to March 2004. Notably, plaintiff does not claim that the parties agreed to a third extension. (Insinga Dep. at 35.) Moreover, the emails between Insinga and Gentis in mid-February of 2003 confirm that Insinga would transfer "all Yorkshire business duties to Hans [at the] end of Feb [sic] and at the same time all responsibility for litigation matters will be given to Bill Bilbao." (Heller Aff., Ex. G.) Insinga further wrote that he understood "from Hans I will start back full time in Corp. Finance March 1 as my Yorkshire assignment/arrangement will be finally over." (*Id*.) While there is some evidence that plaintiff continued to be consulted on Yorkshire matters, he has adduced no evidence that his <u>assignment</u> to this matter did not end February 2003, as he conceded in his e-mail communications. Accordingly, the Court concludes that there is no triable issue of fact as to whether the Agreement was extended by operation of law beyond March 31, 2003, or was in existence at the time of his termination in April 2003. The

18

undisputed evidence is to the contrary. The Court therefore grants summary judgment with respect to this claim.

### B. *The Modification of the Change in Purpose Provision*

With respect to plaintiff's second claimed breach, plaintiff has asserted that the Extension Agreement removed two key conditions of the Change in Purpose provision in the original Agreement, and this entitled him to compensation under another provision which provided for certain payments in the event the Bank did not renew the Agreement under "the existing terms." It is clear that the Extension Agreement changed material terms of the original Agreement in that it changed (1) the identity of the officers to whom he would report and (2) the timing of the sale of Yorkshire assets. (Lerner Decl., Ex. L.) Defendant responds, however, that plaintiff agreed to these changes and also agreed that neither change would give rise to a claim for payment. (Def.'s Reply Mem. at 5-6.)

At the outset, the Court notes that plaintiff never pled this alleged breach in his complaint. S*ee Beckman v. U.S. Postal Service*, 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000) ("Because a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts in this District have consistently ruled that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.") (internal citations and quotations omitted); *Caribbean Wholesale & Service Corp. v. U.S. JVC Corp.*, 963 F. Supp. 1342, 1359 (S.D.N.Y. 1997) (asserting a claim not pleaded in the complaint "is inappropriate at the summary judgment stage, after the close of discovery, without the Court's leave, and in a brief in opposition to a dispositive motion.")

Even considering this new argument, the Court concludes that the claimed breach has no merit as a matter of law. Plaintiff admitted that he read and the Extension Agreement prior to signing it and understood that he would now be reporting to Broekhuyse and Bilbao. (*Id.* at 51.) Moreover, he specifically waived any potential rights arising under the Agreement since the Extension Agreement provided that "[t]his change in personnel will not give rise to any claims by you under the [original] Agreement." (Lerner Decl., Ex. L.) Likewise, plaintiff agreed to undertake a sale of the Yorkshire assets "as soon as possible" and agreed that any such sale "would not constitute a Change in Purpose under the Agreement." (Id.) Insinga's explicit waiver of any claims arising out of the modifications embodied in the Extension Agreement precludes their assertion in this action.

IV. Conclusion

Defendant's motion for partial summary judgment with respect to Counts Three and Four of the Complaint [17] is granted.

SO ORDERED.

Dated: New York, New York
September 20, 2005

_____
Richard J. Holwell
United States District Judge